IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF WEST VIRGINIA

TOMMY C. HACKLE,
      **Plaintiff,**

v.                                                     **Civil Action No. 1:05CV125**
                                                                   **(Keeley)**

**COMMISSIONER OF
SOCIAL SECURITY,**
      **Defendant.**

## REPORT AND RECOMMENDATION/OPINION

This is an action for judicial review of the final decision of the defendant Commissioner of the Social Security Administration ("Defendant") denying the plaintiff's claim for disability insurance benefits ("DIB") under Title II of the Social Security Act. The matter is awaiting decision on the parties' cross Motions for Summary Judgment, and has been referred to the undersigned United States Magistrate Judge for submission of a Report and Recommendation. 28 U.S.C. § 636(b)(1)(B); Fed. R. Civ. P. 72(b).

## I. PROCEDURAL HISTORY

Plaintiff Tommy C. Hackle ("Plaintiff") protectively filed his application for DIB on March 7, 2002, alleging disability since May 1, 1991, as a result of PTSD- induced stress, anger, anxiety, depression and sleeplessness (R. 84, 135). The claim was denied at the initial and reconsideration levels of review (R. 63, 71). Plaintiff requested a hearing, which Administrative Law Judge ("ALJ") William B. Harmon held on June 26, 2003 (R. 579). Plaintiff, who was represented by counsel, appeared and testified on his own behalf. On September 17, 2003, the ALJ issued a decision finding Plaintiff had not been under a disability, as defined in the Social Security Act, at any time prior to his date last insured, December 1991 (R. 25). The Appeals Council denied Plaintiff's request for review, making the ALJ's decision the final decision of the Commissioner (R.5).

In order to better understand the issues in this matter, the undersigned includes the following brief history:

Plaintiff originally applied for Disability Insurance Benefits ("DIB") and Supplemental Security Income ("SSI") on or about March 17, 1995. Both claims were denied, and no request for reconsideration was filed. Plaintiff filed subsequent applications for DIB and SSI on May 6, 1996, alleging an inability to work since May 6, 1996, due to Post-Traumatic Stress Disorder ("PTSD"). Both were denied initially and at the reconsideration levels and a hearing was held by an ALJ on May 7, 1998. That ALJ found that Plaintiff was not under a disability as defined in the Act at any time through December 31, 1992, the date his insured status expired. The ALJ found, however, that Plaintiff had been disabled by his PTSD since May 6, 1996. Plaintiff was therefore awarded benefits for SSI, but not for DIB. The 1998 Decision also provides:

> It is not necessary to consider the question of whether the unfavorable decision made with respect to the prior claim should be reopened and revised as the claimant's attorney requested that the undersigned decide only the issue at to whether the claimant is entitled to SSI disability benefits based on the May 6, 1996 application.

Subsequent to the 1998 Decision, Plaintiff, through counsel, moved to withdraw his DIB claim. The Decision was therefore amended in November 1998, to include only the SSI claim, which was granted in full, with disability beginning May 6, 1996. In effect, the DIB claim was null and void, as if it had never been raised.

In 2002, Plaintiff filed the present DIB claim. Initially, Defendant argued that Plaintiff's DIB claim was barred by *res judicata*. Subsequently, however, Defendant agreed with Plaintiff that by withdrawing his DIB claim, and because of the Amended Decision effectively deleting the DIB claim and referencing only the SSI claim, *res judicata* did not apply to the DIB claim. The undersigned agrees that *res judicata* does not apply to Plaintiff's DIB claim.

The sole issue in this claim is therefore whether substantial evidence supports the ALJ's determination that Plaintiff was not disabled on or before December 1991, his date last insured.

## II. FACTS

Tommy C. Hackle ("Plaintiff") was born on October 17, 1949, and was 41 years old on May 1, 1991, the date he alleges he became disabled (R. 84). He was 57 at the time of the filing of the present complaint. He finished the 12th grade and has past experience as a cable installer and auto parts store keeper (R. 132). He also has past work experience as a corrections officer.

According to VA treatment records, Defendant served in the Army from 1969 to 1971 with service in Vietnam (R. 172). He was hospitalized in the VA Inpatient Psychiatry Unit in 1995, and again in September 1997. From December 1995 through February 1996, he attended the VA PTSD Clinic. In February 1996, he attended a PTSD program for one week. From September 1996 through May 1997, Plaintiff attended treatment at the VA Day Hospital. From 1997 until 1999 he attended the Chapel Street Clinic and the VA PTSD Program.

Plaintiff last worked in 1991 for the Department of Transportation (R. 172). He had been employed there for three years, but then was fired. Plaintiff reported he was fired for missing many days of work and having significant difficulty in interpersonal functioning, often losing his temper at co-workers, customers, and supervisors.

On November 4, 1998, an individual representing the Interfaith Medical Center in Brooklyn New York, wrote a "To Whom it May Concern" letter, stating that Plaintiff had been treated at their facility from 1989- 1992 (R. 171). At that time, he complained of insomnia due to nightmares brought on by "war trauma." The individual wrote that Plaintiff had come in to the center in a state of depression, displaying periods of uncontrollable crying, which appeared to relate to his time spent

3

in the military. The individual opined that he believed Plaintiff exhibited "what is known today as Post Traumatic Stress Disorder."

On November 26, 1999, Plaintiff was examined by VA doctor Paul C. Liebman for PTSD (R. 172). Dr. Liebman found Plaintiff's social functioning seriously impaired, with few friends and a conflictual relationship with family members. He had not seen his children in over ten years. His relationships were characterized by irritability and explosive behavior. He was isolated due to severe anxiety, especially in crowds of people. Dr. Liebman opined that Plaintiff's symptoms were chronic, severe, and dated back to Plaintiff's service in Vietnam.

Subjectively, Plaintiff reported recurrent and intrusive distressing recollections of traumatic wartime events, nightmares, dissociative episodes, partial amnesia, and restricted range of affect. He had difficulty sleeping, chronic irritability with outbursts of anger, difficulty concentrating, hypervigilance, and an exaggerated startle response. He experienced fluctuating chronic depression between moderate and severe. When his depression was severe he experienced suicidal ideation.

Objective findings included documentation of the traumatic events Plaintiff claimed to have witnessed while in Vietnam. Dr. Liebman found that Plaintiff had no impairment of thought process or communication; did have auditory and visual hallucinations and paranoid ideation; lost his temper inappropriately to situation; displayed violent behavior; experienced both suicidal and homicidal ideation; was able to maintain personal hygiene; was fully oriented; had some short term memory loss; had no obsessive behavior; had pressured, rapid speech, although his speech was logical, relevant and adherent; had occasional panic attacks; and suffered from chronic depression and chronic anxiety; impaired impulse control; and impaired sleep.

Dr. Liebman diagnosed PTSD; Bipolar I Disorder; Polysubstance Dependence in full

Remission; and a GAF of 35.[1]

On April 18, 2000, Dr. Randall Dwenger, M.D., wrote a letter to the Department of Social Services indicating that Plaintiff had been his patient at the Veterans Health Care Center (R. 179). He opined that Plaintiff had persistent PTSD symptoms of severe anxiety, heightened awareness, hypervigilance, poor sleep, paranoid recurrent thoughts, and episodes of feeling like he was reexperiencing traumatic events. He also experienced periods of depersonalization- becoming "numb" and unable to function, had episodic violent outbursts, was highly irritable and agitated, and isolated himself from other people. Dr. Dwenger diagnosed PTSD, Bipolar Affective Disorder, and Polysubstance Dependence in sustained remission.

Dr. Dwenger opined that Plaintiff first experienced PTSD symptoms in 1985, at the time of his separation from his wife. Dr. Dwenger reported that Plaintiff first received treatment for PTSD in 1989, and had had six inpatient psychiatric hospitalizations for PTSD and related symptoms– 2 in 1994, and one each in 1996, 1997, 1999, and 2000.

Dr. Dwenger concluded that at present (2000) Plaintiff was unable to function in a work-like setting. He was currently disabled and unable to work because of his psychiatric condition. Further, Dr. Dwenger opined: "It is likely that this disability is long-term and permanent, and has existed since at least 1992." (R. 181).

In May 2000, The VA awarded Plaintiff 100 percent service connected disability based on PTSD effective December 19, 1994, the first date permitted because it was the date he filed the

---

[1] A GAF of 31-40 indicates: "**Some impairment in reality testing or communication** (e.g., speech is at times illogical, obscure or irrelevant) **OR major impairment in several areas, such as work or school, family relations, judgment, thinking, or mood** (e.g., depressed man avoids friends, neglects family, and is unable to work; child frequently beats up younger children, is defiant at home, and is failing at school.) Dorland's, supra, at 32. (Emphasis in original).

claim.

On August 12, 2003, Licensed Psychologist Eric M. Gerdeman, Ph.D., wrote a Psychological Evaluation of Plaintiff (R. 559). Dr. Gerdeman first noted he had personal knowledge of Plaintiff while he was a patient in the PTSD residential rehabilitation program at the VAMC in 1999. He also reviewed the voluminous medical records, the claim folder, and performed a clinical interview. Dr. Gerdeman noted he had been diagnosing and treating PTSD patients for over 20 years, and was program and clinical director of the PTSD Rehabilitation Program at the VAMC, Martinsburg, until his retirement.

Dr. Gerdeman wrote:

Although the first documentation of the diagnosis of PTSD is in 1995, in the medical records of the VAMC, Bronx, there is evidence that Mr. Hackle years before this hospitalization showed symptoms and sought treatment for problems that were clearly PTSD related. With PTSD the symptoms and the impairment in functioning always are delayed; they do not show up often for years. However, there are episodes of dysfunctional behavior, usually around the anniversary of when the trauma happened or when a current situation is perceived as life threatening or creating excessive stress. They seek treatment for isolated symptoms or problems, such as depression or generalized anxiety or difficulty sleeping, but the underlying diagnosis of PTSD is not given or treated. In my experience one of the difficulties in treating veterans with PTSD is getting them to accept that they have PTSD or a mental disorder. Most veterans have the belief that a good soldier should not be affected by war or if they accept that they have PTSD, people will think that they are just crazy.

Mr. Hackle's service medical records (dated 6/2/70) indicated that he complained while in Vietnam of "feelings of constant fatigue and difficulty sleeping." He was treated with medication. In my recent interview with him, he stated that he continued to have serious difficulty with sleeping . . . .

While working for NYC Department of Corrections from 1972 to 1979, he was taken hostage in 1974 by the Black Liberation Army in a prison riot. A gun was held to his head and his life was threatened. This incident certainly exacerbated his already existing but not yet diagnosed PTSD. He was faced again with a life threatening event over which he had no control. He lashed out with intense anger at the correctional authorities, became very distrustful of them and uncooperative because he believed that they placed him in such a life threatening situation. He was sent for

6

treatment by the Department of Corrections but no records are available because the storage facility for records is contaminated with asbestos.

The report from the Interfaith Medical Center, Brooklyn, NY (dated 11/4/98) provides documentation that Mr. Hackle showed PTSD symptoms and sought treatment in 1989. That report stated: "Mr. Hackle was treated at our facility from 1989 to 1992. At the time he complained of insomnia due to nightmares that were brought on by war trauma. He came here in a state of depression displaying periods of uncontrollable crying (when he spoke of losses from Vietnam combat duty). These symptoms appear to relate to his time spent in the military. I believe Mr. Hackle exhibited what is known today as Post Traumatic Stress Disorder."

The statement from Mrs. Mary Hackle, his mother, clearly indicates that in the late 1980s and early 1990s, when he lived with her, her son experienced PTSD symptoms, such as nightmares, hyperalertness, startle response and emotional numbing, and showed major impairment in his functioning, such as insolation/withdrawal, interpersonal difficulty and concentration problems.

Mr. Hackle's use of alcohol and drugs is not material to the issue of his social/industrial impairment or disability. He would have experienced the symptoms of PTSD and the social/industrial impairment because of his PTSD, even if he had not used alcohol or drugs. I have found in the 20 years of treating veterans with PTSD that the majority of them have used alcohol or drugs as a means of coping with the traumatic and disturbing memories and emotions and they continue to use, until they are correctly diagnosed with PTSD and receive appropriate treatment.

Although I did not treat Mr. Hackle until 1999, from my years of experience in treating veterans with PTSD, I know that there is a predictable pattern to their treatment, namely denial of problem; episodes of dysfunctional behavior; seeking treatment for only isolated problems, such as depression, anxiety, sleep disturbance, physical ailments; often the use of alcohol and/or drugs as a way of coping with PTSD symptoms and then finally they are correctly diagnosed with PTSD and treated. During this same period of time, their social and industrial impairment becomes more severe and debilitating because the PTSD symptoms become more frequent and significantly interfere with normal life functioning. From my review of the records and my clinical experience, my professional judgment is that Mr. Hackle experienced traumatic events in Vietnam causing PTSD; he had an initial stress reaction in Vietnam; the PTSD was exacerbated by the prison riot; he began seeking treatment in the 1980s and 1990s; he used alcohol and drugs as a way of coping; and he began to get appropriate treatment for PTSD in the mid-1990s. However, his social and industrial impairment because of the PTSD had become markedly severe in the late 1980s and continues to be so today.

Plaintiff's attorney provided Interrogatories to Dr. Gerdeman for his completion (R. 564). Dr. Gerdeman completed the Interrogatories in August 2003. He first noted that he had treated Plaintiff since 1999. Dr. Gerdeman opined that Plaintiff had severe PTSD currently. It resulted in a marked degree of restriction of activities of daily living and a marked degree of impairment in maintaining social relationships. Significantly to this matter, however, he also opined: "To a reasonable degree of medical probability, the degree of functional impairment has existed since 1990"(R. 568).

Dr. Gerdeman stated that the objective clinical basis for his answer, was his "direct treatment and examination of the claimant; the claimant's history as available . . . from records [he] routinely rel[ied] on in [his] speciality; the claimant's history as available from other informational sources (family, friends, etc.);" his education; his training; and his experience.

Dr. Gerdeman also completed a Medical Assessment of Ability to do Work-Related Activities (Mental), opining that Plaintiff had a poor ability to relate to co-workers, deal with the public, use judgment, interact with supervisors, maintain attention and concentration, understand, remember and carry out complex or detailed job instructions, behave in an emotionally stable manner, and relate predictably in social situations. He would have only a fair ability to maintain personal appearance, demonstrate reliability, understand, remember and carry out simple job instructions, follow work rules, and function independently. Significantly, Dr. Gerdeman opined that based on his diagnosis and findings, the limitations set forth in the assessment had existed at the same severity since at least 1990 (R. 573).

### III. ADMINISTRATIVE LAW JUDGE DECISION

Utilizing the five-step sequential evaluation process prescribed in the Commissioner's

regulations at 20 C.F.R. § 404.1520, the ALJ made the following findings:

1. The claimant meets the nondisability requirements for a Period of Disability and Disability Insurance Benefits set forth in Section 216(i) of the Social Security Act and is insured for benefits through December 31, 1992.

2. The claimant has not engaged in substantial gainful activity since the alleged onset of disability.

3. The claimant did not have any impairment or impairments that significantly limited his ability to perform basic work-related activities at any time prior to December 31, 1992 (20 CFR § 404.1521).

4. The claimant was not under a "disability," as defined in the Social Security Act, at any time through the date of this decision (20 CFR § 404.1520(c)).

(R. 25).

## IV. DISCUSSION
### A. Scope of Review

In reviewing an administrative finding of no disability the scope of review is limited to determining whether "the findings of the Secretary are supported by substantial evidence and whether the correct law was applied." Hays v. Sullivan, 907 F.2d 1453, 1456 (4th Cir. 1990). The Fourth Circuit held, "Our scope of review is specific and narrow. We do not conduct a de novo review of the evidence, and the Secretary's finding of non-disability is to be upheld, even if the court disagrees, so long as it is supported by substantial evidence." Smith v. Schweiker, 795 F.2d 343, 345 (4th Cir.1986). Substantial evidence is "such relevant evidence as a reasonable mind might accept to support a conclusion." Richardson v. Perales, 402 U.S. 389, 401 (1971) (quoting Consolidated Edison Co. v. NLRB, 305 U.S. 197, 229 (1938)). Elaborating on this definition, the Fourth Circuit has stated that substantial evidence "consists of more than a mere scintilla of evidence but may be somewhat less than a preponderance. If there is evidence to justify a refusal to direct a verdict were

the case before a jury, then there is 'substantial evidence.'" Hays, 907 F.2d at 1456 (quoting Laws v. Celebrezze, 368 F.2d 640, 642 (4th Cir. 1968)). In reviewing the Commissioner's decision, the reviewing court must also consider whether the ALJ applied the proper standards of law: "A factual finding by the ALJ is not binding if it was reached by means of an improper standard or misapplication of the law." Coffman v. Bowen, 829 F.2d 514, 517 (4th Cir. 1987).

### B. Contentions of the Parties

Plaintiff contends:

In finding that the Plaintiff was not entitled to a period of disability and disability insurance benefits the Administrative Law Judge totally disregarded the opinion of Dr. Eric Gerdeman, Ph.D., who has been the claimant's treating psychologist since 1999.

Defendant contends:

The ALJ considered Dr. Gerdeman's opinion and complied with the regulations when giving it reduced weight.

### C. Disability on or Before December 31, 1992 (DLI)

There is only one material issue remaining in this case. It is undisputable that SSA found Plaintiff met a listing for anxiety, and was disabled due to PTSD, since May 6, 1996 (R. 44). He was granted SSI benefits based on that decision. Plaintiff withdrew his DIB claim at this time. After Plaintiff withdrew his DIB claim, all references to DIB were deleted from the ALJ's decision, and the decision that Plaintiff was disabled as of May 6, 1996, was entitled "Notice of Amended Decision – Fully Favorable" (R. 30) (emphasis added). The undersigned therefore finds, and the parties have agreed, that the DIB claim was effectively withdrawn and therefore not subject to *res judicata*.

Defendant has already been found by SSA to have been disabled since May 6, 1996, due to

10

meeting the listing. The question before the second ALJ was whether Plaintiff was disabled on or before December 31, 1992. Plaintiff presented new evidence in the form of the current and retrospective opinion of his treating psychologist, Dr. Gerdeman. Neither Defendant nor the ALJ disputes that Dr. Gerdeman was a treating psychologist. He began treating Plaintiff in 1999.

The Fourth Circuit case of Wooldridge v. Bowen, 816 F.2d 157 (4th Cir. 1987), like the case at bar, involved a retrospective opinion by a treating physician. In that case, the claimant applied for disability benefits in 1984, alleging she had been disabled since 1981, due to emphysema. Id. at 158. The record contained no medical evidence concerning the claimant's condition prior to her date last insured of December 31, 1982. At the administrative hearing on her claim, Wooldridge testified she had been unable to afford treatment until August 1983, and, in fact, she continued to work part time until the end of 1982. She began treatment with Alan Milliner, M.D. in August 1983. Subsequent to the hearing, Dr. Milliner wrote to Wooldridge's counsel that it was "apparent that Wooldridge began having significant problems with her breathing about fifteen years ago and for a number of years had used a non-prescription Primatene Mist Inhaler several times a day." Id. Dr. Milliner also opined that "based on claimant's history, she has been severely disabled by her asthma since at least 1980 ." Id.

In his decision denying benefits, the ALJ in Wooldridge found that the claimant had COPD which was severe, but that she was not disabled. Wooldridge appealed first to the Appeals Council, then to the district court. The Magistrate Judge to whom the case was referred found:

> The only evidence of a significant impairment existing before December 31, 1982, is by history.... Also, the plaintiff continued to work until sometime in December, 1982.... There is no question that after December 1982, the plaintiff suffered from some severe impairments, but not before that date.

11

Id. at 159. The Magistrate Judge concluded that "the record does not show the presence of a severe nonexertional impairment prior to December 31, 1982." Id. The district court affirmed the Magistrate Judge's decision. Specifically, the district court concluded that Dr. Milliner's report was not supported by the record, stating:

> The medical testimony and opinion based thereon taken and rendered by Dr. Milliner were properly given no consideration by the Magistrate, even though they came from a "treating" physician. The evidence in the form offered is pure hearsay and does not satisfy the requirements of admissibility under Rule 803(4), Federal Rules of Evidence. Subsequent history taken by Dr. Milliner was not for the purposes of treatment or diagnosis but rather done to supply a critical evidentiary requirement in support of Plaintiff's claim for benefits under the Act. In other words, it was prepared solely for the purposes of this litigation. Since the doctor's opinion has no evidentiary support in the record and is, in fact, contradicted by the record, it properly was not considered by the Magistrate or Secretary in their conclusions to deny benefits.

Id.

On appeal, Wooldridge contended that Dr. Milliner's opinion and her post-1982 evidence of disability were improperly disregarded. The Fourth Circuit agreed, noting:

> Furthermore, this Court has held that medical evaluations made subsequent to the expiration of a claimant's insured status are not automatically barred from consideration and may be relevant to prove a previous disability . . . .
>
> Dr. Milliner was a member of the staff of the clinic that had treated Wooldridge since she first sought help for her problems in August 1983. As such, we find that even though his opinion is based largely on the claimant's medical history, it concerns the progressively deteriorating nature of her breathing impairment and must be considered on remand.

Id. at 160.

In a subsequent case, Wilkins v. Secretary, 953 F.2d 93 (4th Cir. 1991), the Fourth Circuit again upheld a treating physician's retrospective opinion. In Wilkins, the claimant had been treated for depression by a Dr. Liu for approximately a year in 1981. Id. at 96. Subsequently, she did not seek any treatment until March 28, 1987, six years later, when she was again treated for depression

12

by Dr. Liu. The claimant's disability insured status ended December 31, 1986, however. The claimant submitted a letter written by Dr. Liu, which stated:

> <u>According to Mrs. Wilkins</u>, from December 1986, until I saw her on March 28, 1987 both her mental and physical symptoms basically remained constant. <u>She has told me</u> that during this period of about thee months she was not able to do anything, even her household duties. This is consistent with the nature of her psychiatric illness, the history of that illness, and my observations of her.
>
> Judged from her history and the nature of illness, in my opinion, she was disabled as of at least December 31, 1986.

Id. at 94 (emphasis added). On appeal, the Fourth Circuit first noted that Dr. Liu was the claimant's treating physician in 1987. The court then stated:

> This court has recognized that a treating physician may properly offer a retrospective opinion on the past extent of an impairment. As Wilkins' treating physician, Dr. Liu's opinion is entitled to great weight. <u>An ALJ may not reject a treating physician's opinion, based on medical expertise, concerning the extent of past impairment in the absence of persuasive contrary evidence</u>. The Secretary failed to offer expert or medical evidence that can be viewed as contradicting Dr. Liu's opinion that Wilkins was disabled prior to December 31, 1986. Because the record contains this uncontradicted evidence from Wilkins' treating physician, we conclude that the ALJ's finding that Wilkins' disability did not begin until March 28, 1987 is not supported by substantial evidence. Accordingly, we reverse the Secretary's denial of DIB and remand for further proceedings.

Id. (emphasis added).

In the case at bar, the ALJ rejected Dr. Gerdeman's opinion that Plaintiff was disabled on or before his date last insured, stating:

> His opinion that the claimant was disabled due to post traumatic stress disorder (PTSD) prior to December 31, 1992, is based on subjective allegations of the claimant and his mother . . . , and on a review of the claimant's voluminous Veterans Affairs (V.A.) medical records . . . . Dr. Gerdeman specifically cites the fact that the claimant was treated for PTSD from 1989 to 1992.
>
> However, in the prior ALJ's decision, it was noted that the claimant reported that he worked until January 15, 1992 (see finding Number 1 on p. 6 in the Decision dated September 22, 1998 at B1A). Furthermore, the claimant's [sic] fails to offer any

13

> objective medical evidence or treating source opinion prior to December 31, 1992 that would support his allegation of total disability due to any impairment. This severely undermines Dr. Gerdeman's opinion that claimant's PTSD resulted in any severe limitations of his ability to perform basic work activity prior to December 31, 1992, his date last insured.
>
> For the same reasons discussed above, Dr. Gerdeman's responses to the Interrogatories dated August 12, 2003 . . . are accorded little weight, as to the issue of whether the claimant was disabled prior to December 31, 1992.
>
> Finding Number 3 on p. 6 in the Decision dated September 22, 1998 . . . indicates that the claimant had a drug and alcohol abuse problem on December 31, 1992. This fact was corroborated by the claimant at the hearing who testified that he was addicted to drugs until 1994. It is noted that Dr. Gerdeman stated in his psychological evaluation that the claimant's drug and alcohol abuse was not material to his alleged disability prior to December 31, 1992. However, the undersigned finds Dr. Gerdeman's opinion to be unpersuasive as it was rendered on August 12, 2003, almost 11 years after his date last insured, and was not based on an actual mental status examination of the claimant at that time. Thus, his opinion is too far remote in time to be considered credible.

(R. 24). The undersigned finds a number of problems with the ALJ's Decision, not the least of which is that the two Findings he cites from the previous ALJ's decision were both expressly deleted by that ALJ in his amended decision and therefore are of no effect. Second, there was no support for the first ALJ's finding that Plaintiff worked until January 15, 1992. The evidence in the record indicates he stopped working in May 1991. Further, the record does indicate, as Dr. Gerdeman states, that Plaintiff was treated for PTSD from 1989 to 1992, although not by the VA. Finally, even if Dr. Gerdeman's opinion that Plaintiff's drug addiction was not material was improper, before the ALJ can consider a drug or alcohol addiction material, he must follow the procedure in §404.1535.[2]

---

[2] § 404.1535 How we will determine whether your drug addiction or alcoholism is a contributing factor material to the determination of disability.

(a) General. If we find that you are disabled and have medical evidence of your drug addiction or alcoholism, we must determine whether your drug addiction or alcoholism is a contributing factor material to the determination of disability.

The ALJ here did not do so.

Most importantly, however, the undersigned finds, as did the Fourth Circuit in <u>Wilkins</u>, that as Plaintiff's treating physician, Dr. Gerdeman's opinion is entitled to great weight. "An ALJ may not reject a treating physician's opinion, based on medical expertise, concerning the extent of past impairment in the absence of persuasive contrary evidence." <u>Wilkins</u>, <u>supra</u>. Also as in <u>Wilkins</u>, "The Secretary failed to offer expert or medical evidence that can be viewed as contradicting [Dr. Gerdeman's] opinion that [Plaintiff] was disabled prior to December 31, [1992]. Because the record contains this uncontradicted evidence from [Plaintiff's] treating physician, [I] conclude that the ALJ's finding that [Plaintiff's] disability did not begin until [May 1996] is not supported by substantial evidence."

Not only is there no expert or medical evidence contradicting Dr. Gerdeman's opinion, but

---

(b) Process we will follow when we have medical evidence of your drug addiction or alcoholism.

(1) The key factor we will examine in determining whether drug addiction or alcoholism is a contributing factor material to the determination of disability is whether we would still find you disabled if you stopped using drugs or alcohol.

(2) In making this determination, we will evaluate which of your current physical and mental limitations, upon which we based our current disability determination, would remain if you stopped using drugs or alcohol and then determine whether any or all of your remaining limitations would be disabling.

(I) If we determine that your remaining limitations would not be disabling, we will find that your drug addiction or alcoholism is a contributing factor material to the determination of disability.

(ii) If we determine that your remaining limitations are disabling, you are disabled independent of your drug addiction or alcoholism and we will find that your drug addiction or alcoholism is not a contributing factor material to the determination of disability.

there is in the record medical evidence that supports his opinion. First, there is the report from the Interfaith Medical Center stating that Plaintiff had been treated at the facility from 1989 to 1992, for complaints of insomnia due to nightmares brought on by war trauma. The individual who wrote the letter opined that Plaintiff exhibited symptoms of what is known today as PTSD. Second, Dr. Liebman opined in 1999, that Plaintiff's symptoms were chronic, severe, and dated back to his service in Vietnam. Third, Dr. Dwenger opined in 2000, that Plaintiff first experienced PTSD symptoms in 1985, first received treatment for PTSD in 1989, and that it was "likely that this disability is long-term and permanent, and has existed since at least 1992." Finally, Plaintiff's mother corroborated Dr. Gerdeman's opinion, indicating that Plaintiff experienced PTSD symptoms and showed major impairment in functioning during the late 1980's and early 1990's. While the ALJ dismissed Plaintiff's mother's report as "subjective allegations," the undersigned notes this is the same type of evidence used by the treating physicians in Wooldridge and Wilkins in making their retrospective opinions.

Importantly, based on the facts of this particular case, the undersigned does not find Dr. Gerdeman's opinion that Plaintiff had been disabled five years before he first treated him and eleven years before his opinion was rendered incredible. The undersigned finds significant that Plaintiff was found disabled by the Social Security Administration itself, based on his meeting a listing for PTSD, as of May 1996. That he may have been disabled three years earlier by the same mental impairment is not beyond comprehension. This is not to say that Plaintiff was disabled on or before December 31, 1992, but only that substantial evidence does not support the ALJ's rejection of the treating physician's retrospective opinion or his resulting determination that Plaintiff did not have any severe mental or physical impairment on or before his date last insured and was therefore not disabled as of that date.

16

## V. RECOMMENDATION

For the reasons above stated, I find that substantial evidence does not support the Commissioner's decision denying Plaintiff's application for DIB. I accordingly respectfully **RECOMMEND** Defendant's Motion for Summary Judgment [Docket Entry 13] be **DENIED**, and Plaintiff's Motion for Summary Judgment [Docket Entry 12] be **GRANTED** by reversing the Commissioner's decision under sentence four of 42 U.S.C. §§ 405(g) and 1383(c)(3), with a remand of the cause to the Commissioner for further proceedings consistent and in accord with this Recommendation.

Any party may, within ten (10) days after being served with a copy of this Report and Recommendation, file with the Clerk of the Court written objections identifying the portions of the Report and Recommendation to which objection is made, and the basis for such objection. A copy of such objections should also be submitted to the Honorable Irene M. Keeley, Chief United States District Judge. Failure to timely file objections to the Report and Recommendation set forth above will result in waiver of the right to appeal from a judgment of this Court based upon such Report and Recommendation. 28 U.S.C. § 636(b)(1); United States v. Schronce, 727 F.2d 91 (4th Cir. 1984), cert. denied, 467 U.S. 1208 (1984); Wright v. Collins, 766 F.2d 841 (4th Cir. 1985); Thomas v. Arn, 474 U.S. 140 (1985).

The Clerk of the Court is directed to send a copy of this Report and Recommendation to counsel of record.

Respectfully submitted this /2 day of October, 2007.

JOHN S. KAULL
UNITED STATES MAGISTRATE JUDGE